LAW OFFICE OF
RICHARD E. SIGNORELLI
799 Broadway, Suite 539
New York, NY 10003
Telephone:   212 254 4218
Facsimile:   212 254 1396
rsignorelli@nycLITIGATOR.com[SM]
www.nycLITIGATOR.com[SM]
*Attorneys for Defendants David I. Lustig, individually*
*and in his capacity as Trustee for The Lustig Family*
*1990 Trust, and The Lustig Family 1990 Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

SECURITIES INVESTOR PROTECTION
CORPORATION,                                          Adv. Pro. No. 08-01789 (SMB)

                    Plaintiff-Applicant,             SIPA LIQUIDATION

          v.                                          (Substantively Consolidated)

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,
                                                      **DEFENDANTS' MEMORANDUM**
                    Defendant.                        **OF LAW IN OPPOSITION TO**
-------------------------------------------------------------------x   **TRUSTEE'S MOTION TO**
In re:                                                **STRIKE CERTAIN**
                                                      **AFFIRMATIVE DEFENSES**
BERNARD L. MADOFF,

                    Debtor.
-------------------------------------------------------------------x

IRVING PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

                    Plaintiff,                        Adv. Pro. No. 10-4554 (SMB)

          v.

DAVID IVAN LUSTIG,

                    Defendant.

------------------------------------------------------------------x

IRVING PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

                Plaintiff,                        Adv. Pro. No. 10-4417 (SMB)

      v.

THE LUSTIG FAMILY 1990 Trust, et al.,

                Defendants.

------------------------------------------------------------------x

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.............................................................................................iv

PRELIMINARY STATEMENT ....................................…..............................................1

RELEVANT FACTUAL BACKGROUND........................................................................2

A.  The IRA CASE (ADV. PRO. NO. 10-4454)........…...............................................2

    1.  The Trustee's Claim In The IRA Case ……….........................................2

    2.  The Trustee Has Already Recovered The Entire $2,000,000
        That Was Withdrawn From The IRA Account….................................3

        a.  Transfer Of The $2,000,000 From BLMIS To Fiserv
            And From Fiserv To Lakeview ……..............................................3

        b.  Transfer Of The $2,000,000 From Lakeview To
            Wailea ……...................................................................................4

        c.  Transfer Of The $2,000,000 From Wailea To HSBC................................5

        d.  Transfer Of The $2,000,000 From HSBC To Senator
            And Reinvestment Of That Money Into BLMIS...........................6

        e.  Withdrawal Of The $2,000,000 From BLMIS And
            The Trustee's Subsequent Recovery Of That Money
            Pursuant To The Settlement Agreement With
            Senator....................................................................................7

B.  THE TRUST CASE (ADV. PRO. NO. 10-4417).....…….............................................9

    1.  The Trustee's Claim In The Trust Case ……….......................................9

    2.  The Entire $5,000,000 That Was Withdrawn From The
        Trust Account On July 24, 2007 Has Already Been
        Returned To The BLMIS Estate ...…...................................................10

        a.  Transfer Of The $5,000,000 From BLMIS To City
            National Bank And From City National Bank To
            Lakeview…..................................................................................10

i

b.  Transfer Of The $5,000,000 From Lakeview To Rye XL……....................................................................................11

c.  Transfer Of The $5,000,000 From Rye XL To The Financial Institution Leverage Provider As Cash Collateral........................................................................12

d.  Transfer Of The $5,000,000 From The Financial Institution Leverage Provider To Broad Market Fund And Reinvestment Of That Money Into BLMIS....................................................................13

RELEVANT PROCEDURAL BACKGROUND........................…...........................15

A.  The Affirmative Defenses At Issue........……..............................................15

1.  Eight And Ninth Affirmative Defenses (Based On The Court's Equitable Powers Under 11 U.S.C. § 105(a)).....................................15

2.  Tenth Affirmative Defense (Based On The Single Satisfaction Rule Under 11 U.S.C. § 550(d)……...........................................16

3.  Eleventh Affirmative Defense (Based On The Theory Of Recoupment........................................ ……...............................16

B.  Discovery Has Not Been Completed And Has Effectively Been Stayed Pending The Adjudication Of This Motion.......……....................................17

ARGUMENT......................................…….......................................................18

THE TRUSTEE'S MOTION TO STRIKE
SHOULD BE DENIED IN ITS ENTIRETY

POINT ONE

THE AFFIRMATIVE DEFENSE BASED ON
THE SINGLE SATISFACTION RULE UNDER
§ 550(d) IS VIABLE AND MERITORIOUS
(TENTH AFFIRMATIVE DEFENSE)...........................................................20

A.  Applicable Law...........................................................................20

B.  Analysis....................................................................................22

POINT TWO

THE AFFIRMATIVE DEFENSES BASED ON
THE COURT'S EQUITABLE POWERS UNDER
§ 105 (a) ARE VIABLE AND MERITORIOUS
(EIGHTH AND NINTH AFFIRMATIVE DEFENSES).......................................................26

    A.    Applicable Law....................................................................................26

    B.    Analysis.......................................................................................27

POINT THREE

THE AFFIRMATIVE DEFENSE BASED ON
THE THEORY OF RECOUPMENT IS VIABLE AND
AND MERITORIOUS (ELEVENTH AFFIRMATIVE DEFENSE)...............................31

    A.    Applicable Law....................................................................................31

    B.    Analysis.......................................................................................32

POINT FOUR

THE TRUSTEE HAS NOT SHOWN THAT HE
WILL BE PREJUDICED BY THE INCLUSION
OF THE AFFIRMATIVE DEFENSES AT ISSUE.............……................................33

CONCLUSION.................……….....................................................................35

## TABLE OF AUTHORITIES

**Cases**

Bakst v. Sawran, 359 B.R. 348 (Bankr. S.D. Fl. 2007)............................................................26, 27

Canadian St. Regis Band of Mohawk Indians v. New York,
        278 F.Supp.2d 313 (N.D.N.Y. 2003)................................................................................18

Dobin v. Presidential Fin. Corp. of Delaware Valley (In re Cybridge Corp.),
        312 B.R. 262 (Bankr. D.N.J. 2004)......................…………...........21, 24, 26, 27, 28, 29-30

Gropper v. Unitrac, S.A., 33 B.R. 334 (Bankr. S.D.N.Y. 1983)...............................................26-27

In re Bean (McCord v. Agard), 252 F.3d 113 (2nd Cir. 2001)...................................................20-21

In re Meredith (Terry v. Meredith), 367 B.R. 558 (E.D. Va. 2007).........................................20, 21

In re Patts (Lassman v. Patts), 470 B.R. 234 (Bankr. D. Ma. 2012)...............................................21

Index Fund, Inc. V. Hagopian, 107 F.R.D. 95 (S.D.N.Y. 1985)...................................19, 25, 30, 32

Merrill v. Abbott (In re Independent Clearing House Co.), 77 B.R. 843 (D. Utah 1987).......31, 32

New York State Elec. and Gas Corp. v. McMahon, 129 F.3d 93 (2nd Cir. 1997).........................31

Oneida Indian Nation of New York v. New York, 194 F.Supp.2d 104 (N.D.N.Y. 2002).......19-20

Salcer v. Envicon Equities Corp., 744 F.2d 935 (2nd Cir. 1984).................................18, 20, 25, 30

SEC v. McCaskey, 56 F.Supp.2d 323 (S.D.N.Y. 1999).....................…………...........................19

Specialty Minerals, Inc. V. Pluess-Staufer AG, 395 F.Supp.2d 109 (S.D.N.Y. 2005).................18

State of New York v. United Parcel Service, Inc., 160 F.Supp.3d 629 (S.D.N.Y. 2016)..............19

Styler v. Jean Bob Inc., 154 B.R. 581 (D. Utah 1993)...................................................................31

Walsh v. City of New York, 585 F.Supp.2d 555 (S.D.N.Y. 2008)......................…..............19, 25

Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138 (2nd Cir. 2002)...........................................31

**Statutes**

11 U.S.C. § 105(a)............................……………..........................15, 16, 26, 27, 28, 30

11 U.S.C. § 548(a)(1)(A)................................…….....................................................3, 10

11 U.S.C. § 549........................................……......…….................................................27

11 U.S.C. § 550........................................……….……................................................27, 29

11 U.S.C. § 550(a)...................................……….........................................3, 10, 20, 21

11 U.S.C. § 550(d).................................……….....................16, 20, 21, 22, 24, 26

11 U.S.C. § 553........................................………………................................................17 n.5

**Rules**

Fed. R. Bankr. P. 7012.............................……….…...................................................18

Fed. R. Civ. P. 12(f).................................……….…...................................................18

Fed. R. Civ. P. 12(f)(2)...........................……….…...................................................18 n.6

Defendants David I. Lustig ("Mr. Lustig") and The Lustig Family 1990 Trust ("Trust") (Mr. Lustig and the Trust are sometimes referred to collectively as "Defendants") respectfully submit this memorandum of law in opposition to the Trustee's motion to strike certain of the affirmative defenses asserted in <u>Irving H. Picard v. David Ivan Lustig</u>, Adv. Pro. No. 10-4554 ("IRA Case") and <u>Irving H. Picard v. The Lustig Family 1990 Trust and David I. Lustig</u>, Adv. Pro. No. 10-4417 ("Trust Case").  For the reasons discussed below, the motion to strike should be denied in its entirety.

<u>**PRELIMINARY STATEMENT**</u>

The IRA Case and the Trust Case are unlike any other case in which the Trustee is seeking avoidance and recovery of allegedly fraudulent transfer made within two years of Bernard L. Madoff Investment Securities LLC's ("BLMIS") collapse.  They are totally unique because in these cases the Trustee is seeking to recover money <u>that has already been returned to the BLMIS estate</u>.

As discussed in detail below, the evidence and information currently available in the record show that the money that the Trustee is seeking to recover from Mr. Lustig in the IRA Case has already been  recovered by the Trustee from another transferee pursuant to a settlement agreement.  In the Trust Case, the evidence and information currently available show that the money that the Trustee is seeking to recover from Defendants was reinvested into BLMIS where it remained until BLMIS's fraud was discovered (and to the extent any of that money was withdrawn after it was reinvested into BLMIS, the Trustee has recovered it from another transferee pursuant to a settlement agreement).

It bears emphasizing that Mr. Lustig and the Trust are innocent good faith investors who have been totally devastated by BLMIS's fraud.  They lost all their direct and

indirect investments in BLMIS as a result of the fraud.  Essentially, the Trustee is seeking to

recover from them money that they never actually received that has already been returned to the

estate.  If the Trustee were to succeed, Mr. Lustig will be bankrupted due to sustaining, in effect,

a doubling of his BLMIS losses, since he has already lost the money that the Trustee is now

seeking to recover from him.

   The affirmative defenses asserted in the IRA Case and the Trust Case that the

Trustee is asking the Court to strike are based on well-established law and equitable principles

aimed at preventing a bankruptcy trustee from recovering from a transferee money that has

already been returned to the estate.  They are viable and meritorious defenses that totally defeat

the Trustee's claims in both cases.  The Trustee's motion to strike these defenses should be

denied in its entirety.

**RELEVANT FACTUAL BACKGROUND**

**A.  THE IRA CASE (ADV. PRO. NO. 10-4454)**

   **1.  The Trustee's Claim In The IRA Case**

   Mr. Lustig held an individual retirement account with BLMIS, Account No.

IZR297 ("IRA Account").  (First Amended Complaint in the IRA Case ("FAC-IRA") ¶ 31 (Dkt.

No. 60 in the IRA Case); Exh. A to FAC-IRA).  On July 25, 2007, a withdrawal of $2,000,000

was made from the IRA Account.  (Exh. B to FAC-IRA).  This was the only withdrawal ever

made from the account.  (Id.).  There is no allegation that the withdrawal was not made in good

faith.  The Trustee does not allege that Mr. Lustig knew or should have known of BLMIS's

fraud.  He is, indisputably, an innocent party.

   According to the Trustee, $1,863,225 of the $2,000,000 that was withdrawn

2

"represented fictitious profits from the Ponzi scheme." (FAC-IRA ¶ 2; Exh. B to FAC-IRA).

The FAC-IRA contains a single cause of action in which the Trustee seeks to avoid this

withdrawal as an actual fraudulent transfer under 11 U.S.C. § 548(a)(1)(A) and to recover the

money withdrawn from Mr. Lustig pursuant to 11 U.S.C. § 550(a). (FAC-IRA ¶¶ 43-48).

### 2.    The Trustee Has Already Recovered The Entire $2,000,000 That Was Withdrawn From The IRA Account

As discussed below, the information and documents currently available in the

record show that the Trustee has already recovered the entire sum of $2,000,000 that was

withdrawn from the IRA Account on July 25, 2007.[1]

### a.    Transfer Of The $2,000,000 From BLMIS To Fiserv And From Fiserv To Lakeview

Mr. Lustig withdrew the $2,000,000 from the IRA Account solely and specifically

for the purpose of immediately reinvesting the money back into BLMIS through a third-party

sub-feeder fund called Lakeview Investment, LP ("Lakeview"). (Exh. B, ¶ 6).

Upon its withdrawal from the IRA Account, the entire sum of $2,000,000 was

transferred to the custodian for Mr. Lustig's IRA account, Fiserv Investment Support Services (or

a subsidiary thereof) ("Fiserv"). (Exh. C). On or about July 26, 2007, Mr. Lustig submitted an

investment authorization form to Fiserv authorizing and directing Fiserv to wire that entire sum

to Lakeview for the purpose of investing the money with Lakeview. (Id.). A copy of Mr.

Lustig's subscription agreement for the Lakeview investment was then sent to Fiserv. (Exh. D).

---

[1] It is anticipated that further discovery will yield additional evidence that will corroborate or further corroborate the facts discussed below. As the Court is aware, Defendants have served discovery demands seeking information and documents pertaining to these issues to which the Trustee has refused to respond. (Exh. A). (Unless otherwise stated, the exhibits referenced herein are attached to the Declaration of Bryan Ha submitted herewith.).

On August 1, 2007, pursuant to Mr. Lustig's direction, Fiserv transferred the

$2,000,000 by wire to Lakeview "to purchase Lakeview Investment LP for [Mr. Lustig's

retirement account]."  (Exh. E).  The funds were received by Lakeview in its bank account at

Wells Fargo Bank, N.A. ("Wells Fargo") that same day.  (Exh. F).  Lakeview confirmed that the

money was received for investment on behalf of Mr. Lustig.  (Exh. G).

Notably, in addition to the $2,000,000 from Mr. Lustig, deposits were also made

into Lakeview's account by other investors for investment with Lakeview during the period from

August 1, 2007 through August 24, 2007.  (Exh. F; Exh. H).

### b.   Transfer Of The $2,000,000 From Lakeview To Wailea

Lakeview invested the $2,000,000 that it received from Mr. Lustig (through

Fiserv) with Wailea Partners, LP ("Wailea"), an investment partnership whose primary objective

was to make leveraged investments in BLMIS feeder funds managed by Senator Fund SPC

("Senator").  (Exh. I at 2, 4).  Wailea's strategy was to "obtain leverage through the use of an

option contract, total return swap or leverage facility to be entered into between [Wailea] and a

reputable, international bank with an established presence in hedge fund lending."  (Id. at 4).

On August 24, 2007, Lakeview executed a Subscription Agreement with Wailea

whereby it agreed to invest $7,000,000 in Wailea.  (Exh. J).  On August 27, 2007, Lakeview

transferred the $2,000,000 that it received from Mr. Lustig together with $5,000,000 from other

investors – a total of $7,000,000 – to Wailea pursuant to the Subscription Agreement.  (Exh. K).

Notably, the Subscription Agreement identified Mr. Lustig as having a 10% or more interest in

Lakeview.  (Exh. J).

4

### c.   Transfer Of The $2,000,000 From Wailea To HSBC

On or about September 4, 2007, consistent with its stated investment objective, Wailea entered into a total return swap transaction with HSBC Bank USA, N.A. ("HSBC") ("Wailea-HSBC Swap").  (Exh. L).  As part of the transaction, Wailea was required, as the swap counterparty, to pay cash collateral to HSBC in the amount of $8,870,000.  (Id. at 2).  The reference fund for the swap was a BLMIS feeder fund managed by Senator called the Senator Equity Segregated Portfolio One ("Senator Fund").  (Id. at 2).

The Trustee has described total return swaps such as the Wailea-HSBC Swap as follows:

> A swap is a bilateral financial transaction created to "swap" the cash flows of an asset or basket of assets for cash flows of another asset.  Swaps enable investor to achieve multiples of the returns from a reference asset – here, a Madoff Feeder Fund [e.g., the Senator Fund]– without having to own the asset.  In exchange for paying the leveraged return on the reference fund at maturity, the financing institution – here, HSBC – collected significant structuring and financing fees on the leveraged amount.

(Exh. M, ¶ 247).    Such swap transactions "directed hundreds of millions of dollars into Madoff's Ponzi scheme through" BLMIS feeder funds (such as the Senator Fund) that served as the reference funds for the swaps.  (Id. ¶ 245).   That is because, in connection with the swaps, "the financing institution [i.e., HSBC] that has promised a leveraged return on the performance of a reference fund[] will hedge its risk by investing both its own money and the cash collateral provided by the swap counterparty. . . directly into the reference fund."  (Id. ¶ 248).

On or about September 4, 2007, Wailea transferred $8,870,000 to HSBC as cash collateral for the Wailea-HSBC Swap.  This sum consisted of the $7,000,000 that Wailea had

received from Lakeview (which sum included the $2,000,000 from Mr. Lustig as discussed above), plus some additional money from other investors. (Exh. N, ¶ 24).

### d. Transfer Of The $2,000,000 From HSBC To Senator And Reinvestment Of That Money Into BLMIS

As noted above, in connection with total return swap transactions like the Wailea-HSBC Swap which required HSBC to pay the swap counterparty leveraged returns based on the performance of the reference fund, HSBC "[would] hedge its risk by investing both its own money and the cash collateral provided by the swap counterparty. . . directly into the reference fund." (Exh. M, ¶ 248).

HSBC thus invested all of the cash collateral that it received from Wailea (which included the $2,000,000 from Mr. Lustig as discussed above), along with its own money, directly into the Senator Fund to hedge its risk under the Wailea-HSBC Swap. This investment was effectuated through HSBC's affiliate HSBC Bank plc ("HSBC plc"). As explained in a complaint filed by Wailea:

> . . . In August 2007, to hedge HSBC USA's anticipated swap with Wailea, HSBC USA's banking affiliate in England and Wales, HSBC Bank plc ("HSBC plc") executed a Subscription Agreement providing for its own direct investment in Senator Fund. On August 27, 2007, Senator and HSBC plc entered into a side letter regarding HSBC plc's investment. . . . The side letter [] included Senator's acknowledgment that "HSBC may issue structured products to third party investors, the return of which may be substantially linked to the return of the [Senator] Fund."

> . . . HSBC plc effected its initial investment in Senator Fund on or about September 4, 2007. To fund HSBC plc's investment, HSBC [] transferred capital to Senator Fund's custodian, HSBC Securities Services (Luxemboug) S.A. [].

6

(Exh. N ¶¶ 36-37).

The Senator Fund, as noted, was a BLMIS feeder fund. The Trustee has acknowledged that this fund "invested exclusively with BLMIS." (Exh. O, ¶ 5). Accordingly, the money that HSBC plc invested in Senator Fund (which included the $2,000,000 from Mr. Lustig) was in turn invested into BLMIS, through Senator's direct account with BLMIS, Account No. 1FR128. (Id. ¶ 6). This was confirmed in a letter from Senator stating that Senator Fund "is fully invested . . . [in] a managed account in Senator's name at [BLMIS]." (Exh. P). Mr. Lustig's $2,000,000, which was withdrawn from his BLMIS account on July 25, 2007, was thus reinvested back into BLMIS.

### e.  Withdrawal Of The $2,000,000 From BLMIS And The Trustee's Subsequent Recovery Of That Money Pursuant To The Settlement Agreement With Senator

In or about late October 2008, HSBC plc redeemed all or substantially all of its direct investments in Senator Fund. (Exh. N, ¶ 39; Exh. Q, ¶¶ 69-71). Approximately $95 million was thus withdrawn from Senator's BLMIS Account No. 1FR128 and transferred to Senator. The money was then subsequently transferred from Senator to HSBC plc (and/or some other HSBC-related entity). (Exh. A to Amended Complaint (Exh. M) in Picard v. HSBC Bank PLC, et al., U.S. Bankr. Ct., S.D.N.Y., Adv. Pro. No. 09-1364 (SMB) ("Picard v. HSBC Adv. Pro."); Exh. M, ¶¶ 325, 352).

Because the approximately $95 million withdrawn from Senator's BLMIS Account No. 1FR128 in or about late October 2008 constituted all or substantially all of HSBC plc's direct investments in Senator Fund, it necessarily included the $2,000,000 from Mr. Lustig

that was part of those direct investments as discussed above.

In 2009, the Trustee commenced the Picard v. HSBC Adv. Pro. in which it asserted claims against HSBC and Senator and HSBC-related entities for avoidance and recovery of the approximately $95 million that was withdrawn from Senator's BLMIS Account No. 1FR128 and subsequently transferred to HSBC plc (and/or some other HSBC-related entity). The Trustee sought to recover the money from Senator as an initial transferee and from HSBC (and other HSBC-related entities) as a subsequent transferee pursuant to 11 U.S.C. § 550(a). (Exh. M, ¶¶ 390-456).

On or about November 13, 2014, the Trustee entered into a settlement agreement with Senator in the Picard v. HSBC Adv. Pro. whereby Senator agreed to pay $95 million to the Trustee "in full and final settlement and satisfaction of all Avoiding Power Claims, Disallowance and Subordination Claims, and any other claims of the Trustee or the BLMIS Estate of every kind and nature whatsoever . . . that the Trustee or the BLMIS Estate may have against Senator." (Exh. R, ¶ 1).

Significantly, the Trustee acknowledged that this settlement amount represents "100%" of the money withdrawn from Senator's BLMIS Account No. 1FR128 over the life of the account. (Id. ¶ 13). Thus with this settlement payment from Senator the Trustee achieved full recovery of the approximately $95 million (which includes the $2,000,000 from Mr. Lustig) that was withdrawn from Senator's BLMIS Account No. 1FR128. Accordingly, the Trustee has fully recovered the $2,000,000 that was withdrawn from the IRA Account on July 25, 2007.

As a result of BLMIS's fraud, Mr. Lustig lost his entire investment in Lakeview. He never received any of the $2,000,000 that was withdrawn from the IRA Account. (Exh. B,

¶¶ 3, 6).[2]

B.      **THE TRUST CASE (ADV. PRO. NO. 10-4417)**

    1.      **The Trustee's Claim In The Trust Case**

        The Trust held an account with BLMIS, Account No. 1ZB268 ("Trust Account"). (First Amended Complaint in the Trust Case ("FAC-Trust") ¶ 32 (Dkt. No. 57 in the Trust Case); Exh. A to FAC-Trust). Over the life of the account withdrawals totaling $25,950,000 were allegedly made from the account. (Exh. B to FAC-Trust). The withdrawals included a $5,000,000 withdrawal made on July 24, 2007, that, as discussed below, has already been returned to the BLMIS estate. (Id.). There is no allegation that any of the withdrawals from the Trust Account was not made in good faith. The Trustee does not allege that Defendants knew or should have known of BLMIS's fraud. They are, indisputably, innocent parties.

        According to the Trustee, of the total amount withdrawn from the Trust Account, $22,608,664 represented principal that had been deposited into the account. (Id.). The Trustee claims that the remaining $4,241,336 "represented fictitious profits from the Ponzi scheme." (FAC-Trust ¶ 2; Exh. B to FAC-Trust). However, this net equity calculation assumes that the $5,000,000 withdrawal made on July 24, 2007, has not been returned to the BLMIS estate. If that money has in fact been returned to the estate as discussed below, then Defendants did not actually receive any fictitious profits as the Trustee claims. They would actually be net losers in the amount of $758,664.

---

[2] Mr. Lustig has since received some compensation for his Lakeview investment losses from Lakeview's settlement with the BLMIS feeder funds in which its money was invested. Mr. Lustig has provided the Trustee with information concerning all such compensation that he has received. In determining Mr. Lustig's net investment losses, the compensation that he has received should be taken into account so that he is not compensated twice for his losses.

The FAC-Trust contains a single cause of action in which the Trustee seeks: (1) to avoid the $5,000,000 withdrawal made on July 24, 2007, and other withdrawals made from the Trust Account within two years of December 11, 2008, as actual fraudulent transfers under 11 U.S.C. § 548(a)(1)(A); and (2) to recover the money that was withdrawn from the account from Defendants pursuant to 11 U.S.C. § 550(a).  (FAC-Trust ¶¶ 47-53).

## 2.    The Entire $5,000,000 That Was Withdrawn From The Trust Account On July 24, 2007 Has Already Been Returned To The BLMIS Estate

As discussed below, the information and documents in the record currently available to Defendants show that the $5,000,000 that was withdrawn from the Trust Account on July 24, 2007, was subsequently reinvested back into BLMIS where it remained until BLMIS's fraud was uncovered.  To the extent that any of the money was withdrawn from BLMIS after it was reinvested back into BLMIS, the Trustee has recovered it pursuant to the settlement agreement entered in Picard v. Tremont Group Hldgs., Inc., et al., U.S. Bankr. Ct., S.D.N.Y., Adv. Pro. No. 10-5310 (SMB) ("Picard v. Tremont Adv. Pro.").[3]

### a.    Transfer Of The $5,000,000 From BLMIS To City National Bank And From City National Bank To Lakeview

Defendants withdrew the $5,000,000 from the Trust Account on July 24, 2007, solely and specifically for the purpose of immediately reinvesting the money back into BLMIS through Lakeview.  (Exh. S, ¶ 6).  Upon its withdrawal from the Trust Account, the entire sum of $5,000,000 was transferred to Mr. Lustig's account at City National Bank.  (Exh. T).  On or about July 30, 2007, pursuant to Mr. Lustig's authorization and direction, the $5,000,000 was

---

[3] See footnote 1.

transferred from City National Bank to Lakeview's bank account at Wells Fargo. (Exh. F). The money was transferred to Lakeview for the purpose of purchasing an investment in Lakeview. (Exh. U).

Notably, in addition to the $5,000,000 deposit from Defendants on July 30, 2007, deposits were also made into Lakeview's account by other investors for investment with Lakeview at around the same time prior to July 31, 2007. (Exh. F).

### b. Transfer Of The $5,000,000 From Lakeview To Rye XL

Lakeview invested the $5,000,000 that it received from Defendants with Rye Select Broad Market XL Fund, L.P. ("Rye XL"). Rye XL was an investment partnership whose investment objective was to provide "a return linked to a 3 times levered exposure to the Rye Select Broad Market Fund, L.P. [("Broad Market Fund")]." (Exh. V). Its strategy was to enter into total return swap transactions with financial institutions that would provide it with three times the return of the Broad Market Fund (the so-called "reference fund"). (Id.; Exh. W, ¶ 61). The Broad Market Fund is a BLMIS feeder fund that invests all or almost all of its assets with BLMIS through its direct account with BLMIS, Account No. 1T0027. (Exh. W, ¶ 36).

On or about July 25, 2007, Lakeview executed a Subscription Agreement with Rye XL whereby it agreed to invest $22,950,000 in Rye XL. (Exh. X). On July 31, 2007, Lakeview transferred the $5,000,000 that it received from Mr. Lustig together with $17,950,000 from other investors – a total of $22,950,000 – to Rye XL to invest with Rye XL pursuant to the Subscription Agreement. (Exh. Y). Notably, the Subscription Agreement identified Mr. Lustig as having a 10% or more interest in Lakeview. (Exh. X).

11

    **c.**   **Transfer Of The $5,000,000 From Rye XL To The
Financial Institution Leverage Provider As Cash
Collateral**

Consistent with its stated investment objective, Rye XL "entered into total return
swaps with other financial institutions such as Lehman Brothers, HSBC, Fortis Bank, Scotia
Bank, and ABN Amro, which provided a synthetic investment for [Rye XL] in the Broad Market
Fund[.]" (Exh. W, ¶ 63). The Broad Market Fund, the so-called "reference fund" in these
transactions, was, as noted above, a BLMIS feeder fund.

In connection with the swaps, Rye XL was required to pay cash collateral to the
financial institution leverage providers, which it did using the money that it received from its
investors (such as Lakeview). (Exh. Z, ¶ 71; Exh. AA, ¶ 62; Exh. M, ¶ 248). Rye XL "could
increase or 'upsize' the value of the swap transaction by providing [the financial institution] with
additional collateral." (Exh. AA, ¶ 71). As discussed above, such swap transactions "directed
hundreds of millions of dollars into Madoff's Ponzi scheme through" BLMIS feeder funds (such
as the Broad Market Fund) that served as the reference funds for the swaps. (Exh. M, ¶ 247).
That is because, in connection with the swaps, "the financing institution that has promised a
leveraged return on the performance of a reference fund[] will hedge its risk by investing both its
own money and the cash collateral provided by the swap counterparty. . . directly into the
reference fund." (Id., ¶ 248; Exh. Z, ¶¶ 74-76; Exh. AA, ¶¶ 65-67).

As discussed above, Lakeview transferred the $5,000,000 that it received from
Mr. Lustig along with money from other investors to Rye XL on July 31, 2007, for investment
with Rye XL. Rye XL, in turn, transferred this money to one of the financial institution leverage
providers with whom it had entered into total return swap transactions as cash collateral for a

12

swap, as it was required to under the terms of the swap. At this time, without additional

discovery (including discovery from the Trustee which the Trustee has refused to provide),

Defendants do not know to which particular financial institution leverage provider this money

was transferred, or for which particular swap transaction it was transferred as collateral. What is

reasonably certain, however, is that the money was transferred to one of the financial institution

leverage providers that did swap transactions with Rye XL as cash collateral for a swap.

> ### d. Transfer Of The $5,000,000 From The Financial Institution Leverage Provider To Broad Market Fund And Reinvestment Of That Money Into BLMIS

As discussed above, in connection with a total return swap, "the financing

institution that has promised a leveraged return on the performance of a reference fund[] will

hedge its risk by investing both its own money and the cash collateral provided by the swap

counterparty. . . directly into the reference fund." (Exh. M, ¶ 248). That was what the financial

institution leverage providers that entered into the total return swap transactions with Rye XL

(which required them to pay Rye XL leveraged returns based on the performance of the Broad

Market Fund) did. They invested all of the cash collateral that they received from Rye XL

(which included the $5,000,000 from Defendants as discussed above) along with their own

money directly into the Broad Market Fund in order to hedge their risks under those swaps.

(Exh. Z, ¶¶ 74-76; Exh. AA, ¶¶ 65-67; Exh. M, ¶ 248).

The Broad Market Fund, as noted, was a BLMIS feeder fund that invested all or

almost all of its assets with BLMIS through its direct account with BLMIS, Account No. 1T0027.

(Exh. W, ¶ 36). Accordingly, the money that the financial institution leverage providers invested

in Broad Market Fund (which included the $5,000,000 from Defendants) to hedge their swap risks was in turn invested into BLMIS through Broad Market Fund's direct account with BLMIS. The $5,000,000 from Defendants that was withdrawn from the Trust Account on July 24, 2007, was thus reinvested back into BLMIS and returned to the BLMIS estate, where it presumably remained invested until BLMIS's fraud was uncovered.  Alternatively, to the extent any of this money was withdrawn from BLMIS prior to its collapse after it was reinvested back into BLMIS, it appears that the Trustee has recovered that money pursuant to the Settlement Agreement that he entered into on or about July 25, 2011, with Broad Market Fund and the other defendants in Picard v. Tremont Adv. Pro.  (Exh. BB).

As a result of BLMIS's fraud, Defendants lost their entire investment in Lakeview.  They never received any of the $5,000,000 that was withdrawn from the Trust Account on July 24, 2007.  (Exh. S, ¶¶ 3, 6).[4]

---

[4] Mr. Lustig has since received some compensation for his Lakeview investment losses from Lakeview's settlement with the BLMIS feeder funds in which its money was invested.  Mr. Lustig has provided the Trustee with information concerning all such compensation that he has received.  In determining Mr. Lustig's and the Trust's net investment losses, the compensation that Mr. Lustig has received should be taken into account so that he is not compensated twice for his losses.

14

## RELEVANT PROCEDURAL BACKGROUND

### A.    The Affirmative Defenses At Issue

Mr. Lustig and the Trust filed their answers to the FAC in the IRA Case and the FAC in the Trust Case on May 2, 2016.  (Dkt. No. 61 in the IRA Case; Dkt. No. 58 in the Trust Case).  In their answers, Mr. Lustig and the Trust asserted affirmative defenses based on the fact that the $2,000,000 withdrawal from the IRA Account on July 25, 2007, and the $5,000,000 withdrawal from the Trust Account on July 24, 2007, that the Trustee is seeking to avoid and recover in the IRA Case and the Trust Case, respectively, have already been returned to the BLMIS estate. Those defenses are as follows:

### 1.    Eighth And Ninth Affirmative Defenses (Based On The Court's Equitable Powers Under 11 U.S.C. § 105(a))

The Eighth Affirmative Defense and the Ninth Affirmative Defense asserted in both the IRA Case and the Trust Case are based on the Court's equitable powers under 11 U.S.C. § 105(a).  In connection with their Eighth Affirmative Defense, Mr. Lustig and the Trust alleged that the withdrawals in question were

> immediately reinvested back into BLMIS through third-party feeder fund Lakeview and thereafter remained invested with BLMIS until all of it was lost as a result of Madoff's fraud. Mr. Lustig [and the Trust], therefore, did not actually receive any fictitious profits and, in fact, lost money as a result of Madoff's fraud.  The Trustee's attempt to recover any portion of this money from Mr. Lustig [and the Trust] even though all of it had been returned to BLMIS and subsequently lost as a result of Madoff's fraud is unreasonable and unconscionable. Under these circumstances, the Court should exercise its equitable powers under 11 U.S.C. § 105(a) and dismiss the Trustee's claim.

In connection with their Ninth Affirmative Defense, Mr. Lustig and the Trust

alleged that the withdrawals in question were

> immediately reinvested back into BLMIS through third-party
> feeder fund Lakeview and thereafter remained invested with
> BLMIS until all of it was lost as a result of Madoff's fraud.
> Mr. Lustig [and the Trust], therefore, did not actually receive
> any fictitious profits and, in fact, lost money as a result of
> Madoff's fraud.  Under these circumstances, the Court should
> exercise its equitable powers under 11 U.S.C. § 105(a) and
> grant Mr. Lustig [and the Trust] an "equitable credit" in the
> full amount (i.e., $2,000,000 [in the IRA Case and $5,000,000
> in the Trust Case]) that [they] had returned to BLMIS through
> [their] Lakeview investment[s].

**2.**    **Tenth Affirmative Defense (Based On The Single
Satisfaction Rule Under 11 U.S.C. § 550(d))**

The Tenth Affirmative Defense asserted in both the IRA Case and the Trust Case

is based on the single satisfaction rule under 11 U.S.C. § 550(d).  In connection with this defense,

Mr. Lustig and the Trust alleged that the Trustee's attempts to avoid and recover the withdrawals

in question, which have already been returned to the BLMIS estate, "violate[] the single

satisfaction rule codified at 11 U.S.C. § 550(d), which bars recovery from a transferee where the

value of the transferred property had already been returned to the estate."

**3.**    **Eleventh Affirmative Defense (Based On The Theory Of
Recoupment)**

The Eleventh Affirmative Defense asserted in both the IRA Case and the Trust

Case is based on the theory of recoupment.  In connection with this defense, Mr. Lustig and the

Trust alleged that, because the withdrawals in question were "immediately reinvested back into

BLMIS" through Lakeview and remained invested there "until all of it was lost as a result of

Madoff's fraud", they "are entitled to an offset or credit under the theory of recoupment in the

full amount (i.e., $2,000,000 [in the IRA Case and $5,000,000 in the Trust Case]) that [they] had

16

returned to BLMIS through [their] Lakeview investment[s]."[5]

## B.    Discovery Has Not Been Completed And Has Effectively Been Stayed Pending The Adjudication Of This Motion

The parties began conducting discovery in the IRA Case and the Trust after case management notices were entered on or about September 20, 2016.  On October 14 and 16, 2016, Defendants served document requests and interrogatories on the Trustee in both the IRA Case and the Trust Case.  Among other things, Mr. Lustig and the Trust sought discovery concerning the flow of the $2,000,000 at issue in the IRA Case and the $5,000,000 at issue in the Trust Case out of BLMIS and ultimately back into BLMIS.  This discovery will show whether the money has in fact already been returned to the BLMIS estate and, as such, is highly relevant to the Trustee's claims and the affirmative defenses asserted by Mr. Lustig and the Trust.

The Trustee failed and refused to provide the discovery requested, leaving Defendants with no choice but to seek judicial intervention.  On January 6, 2017, Mr. Lustig and the Trust submitted a letter to the Court requesting an informal conference to discuss their anticipated motion to compel discovery from the Trustee.  (Exh. A).

On January 27, 2017, following a conference, the Court entered an order authorizing the Trustee to file the instant motion to strike the affirmative defenses discussed above.  (Dkt. No. 73 in the IRA Case).  Essentially, the Court decided that it would first determine whether these defenses are viable before deciding the discovery dispute, and held "any determination relating to relevancy of the discovery requests in abeyance pending the resolution

---

[5] Mr. Lustig and the Trust also asserted an affirmative defense based on the right of set-off under 11 U.S.C. § 553 (Twelfth Affirmative Defense).  They will withdraw this defense at this time.  This defense is therefore not at issue on this motion.

of the" motion to strike. (Id.). Discovery was thus effectively stayed pending resolution of the instant motion.

## ARGUMENT

### THE TRUSTEE'S MOTION TO STRIKE
### SHOULD BE DENIED IN ITS ENTIRETY

The affirmative defenses at issue are viable and meritorious. There is no basis for striking these defenses. The Trustee does not come anywhere close to meeting the extremely stringent standard for striking these defenses pursuant to Fed. R. Civ. P. 12(f).[6]

Fed. R. Civ. P. 12(f), made applicable to these proceedings by Fed. R. Bankr. P. 7012, permits a court to strike any "insufficient defense[.]" "A motion to strike an affirmative defense is not favored and will not be granted unless 'it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense.'" Specialty Minerals, Inc. V. Pluess-Staufer AG, 395 F.Supp.2d 109, 111 (S.D.N.Y. 2005) (quoting Salcer v. Envicon Equities Corp., 744 F.2d 935, 939 (2nd Cir. 1984), vacated and remanded on other grounds, 478 U.S. 1015 (1986)). "[W]hen there has been no significant discovery[,] courts are [even] more reluctant to grant a motion to strike an affirmative defense." Canadian St. Regis Band of Mohawk Indians v. New York, 278 F.Supp.2d 313, 325 (N.D.N.Y. 2003) (bracketed text in original; internal quotation marks and citation omitted).

---

[6]Fed. R. Civ. P. 12(f)(2) requires that a motion to strike an affirmative defense be made within 21 days after service of the pleading in which the defense was asserted, if a response to the pleading is not allowed. The Trustee's motion is clearly untimely as it was made more than nine months after the Trustee was served with the answers in which the affirmative defenses at issue were asserted. While Defendants understand that the Court has given the Trustee permission to make the motion, Defendants are not waiving their objection to the motion on the ground that it is untimely and reserve all their rights in that regard.

"To prevail on a motion to strike, the movant must satisfy a stringent three-pronged test: (1) there must be no question of fact that might allow the defense to succeed; (2) there must be no substantial question of law that might allow the defense to succeed; and (3) the plaintiff must be prejudiced by the inclusion of the defense." State of New York v. United Parcel Service, Inc., 160 F.Supp.3d 629, 637 (S.D.N.Y. 2016) (internal quotation marks and citations omitted).

With regard to the first and second prongs, "a court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the non-moving party's favor." Id. (citation omitted). "The moving party has the burden of demonstrating to the Court to a certainty that plaintiff[] would succeed despite any set of facts which could be proved in support of the defense." Walsh v. City of New York, 585 F.Supp.2d 555, 555 (S.D.N.Y. 2008). In making this determination, the court must consider whether the record contains any fact which the defendant could rely upon to prove its defense. See id. (denying motion to strike an affirmative defense because plaintiff "has not established with the necessary 'certainty' that the record contains no other facts on which the City could rely to prove its culpable conduct defense"). The court must also "construe[] the pleadings liberally to give the defendant a full opportunity to support its claims at trial, after full discovery has been made." SEC v. McCaskey, 56 F.Supp.2d 323, 326 (S.D.N.Y. 1999).

"If the sufficiency of the defense depends upon disputed questions of fact or law, then the motion to strike will be denied." Index Fund, Inc. V. Hagopian, 107 F.R.D. 95, 100 (S.D.N.Y. 1985). "[I]t is generally accepted by courts of this Circuit that it is not appropriate to decide substantial issues of law on a motion to strike. This is particularly true where there has

19

been little or no discovery[.]" <u>Oneida Indian Nation of New York v. New York</u>, 194 F.Supp.2d

104, 117 (N.D.N.Y. 2002).  As the Second Circuit noted in <u>Salcer</u>, "a motion to strike for

insufficiency was never intended to furnish an opportunity for the determination of disputed and

substantial questions of law."  <u>Salcer</u>, 744 F.2d at 939 (internal quotation marks and citations

omitted).  "[C]ourts are very reluctant to determine disputed or substantial issues of law on a

motion to strike" because "these questions quite properly are viewed as determinable only after

discovery and a hearing on the merits.  To do otherwise would be to run the risk of offering an

advisory opinion on an abstract and hypothetical set of facts."  <u>Id.</u> (internal quotation marks and

citations omitted).

**POINT ONE**

**THE AFFIRMATIVE DEFENSE BASED ON
THE SINGLE SATISFACTION RULE UNDER
§ 550(d) IS VIABLE AND MERITORIOUS
(TENTH AFFIRMATIVE DEFENSE)**

The affirmative defense based on the single satisfaction rule (Tenth Affirmative

Defense) is viable and meritorious in both the IRA Case and the Trust Case.  The Trustee's

motion to strike this defense should be denied.

**A.**    <u>**Applicable Law**</u>

Section 550(a) of the Bankruptcy Code provides that, "to the extent that a transfer

is avoided . . . the trustee may recover . . . the property transferred, or, if the court so orders, the

value of such property[.]"  Section 550(d) states that "[t]he trustee is entitled to only a single

satisfaction under [§ 550(a)]."

Section 550(d) thus "bars double recovery of avoidable transferred property."  <u>In

re Meredith (Terry v. Meredith)</u>, 367 B.R. 558, 563 (E.D. Va. 2007); <u>see</u> <u>In re Bean (McCord v.</u>

20

Agard), 252 F.3d 113 (2nd Cir. 2001) ("§ 550(d) categorically limits" the trustee's right of recovery under § 550(a) to a "single satisfaction"). It "empowers courts to prohibit a trustee from recovering under Section 550(a) from a transferee that has already returned to the estate that which was taken in violation of the Code." Dobin v. Presidential Fin. Corp. of Delaware Valley (In re Cybridge Corp.), 312 B.R. 262, 271 (Bankr. D.N.J. 2004).

Accordingly, a trustee is barred from seeking recovery of a fraudulent transfer from a transferee where the value of the transferred property had already been returned to the estate. See Bean, 252 F.3d at 116. Where the value of the fraudulently transferred asset has already been returned to the estate, a further recovery by the trustee "would constitute a windfall to the estate and a prohibited double recovery under 11 U.S.C. § 550(d)." In re Patts (Lassman v. Patts), 470 B.R. 234, 243 (Bankr. D. Ma. 2012).

This prohibition against double recovery means that a transferee who is liable to the estate for a fraudulent transfer "is entitled to offset its liability for the transfer by any amount that the Trustee has already received for it." Meredith, 367 B.R. at 563 (recovery against transferee barred because "[t]he Trustee has already taken possession of, and liquidated, the very property that it now seeks the 'value' of from" the transferee); Bean, 252 F.3d at 117 (recovery of equity the debtor held in the property barred because the trustee had already recovered the value of the equity from the sale of the property).

Importantly in this regard, "[c]ash is fungible." Dobin, 312 B.R. at 271. Thus a transferee liable to an estate for a fraudulent transfer is entitled to an offset for any cash returned to the estate, even if it was not the "same" cash that was improperly transferred from the estate in the first instance. See id. at 271-72.

21

## B.    **Analysis**

The affirmative defense based on the single satisfaction rule under § 550(d) is viable and meritorious in both the IRA Case and the Trust Case.

The IRA Case.  In the IRA Case, the information and documents currently available in the record show that the $2,000,000 withdrawal made from the IRA Account on July 25, 2007, or the value thereof, has already been returned to the BLMIS estate.  As discussed in detail above, Mr. Lustig withdrew this money from the IRA Account solely and specifically for the purpose of immediately reinvesting the money back into BLMIS through Lakeview.  Upon its withdrawal from BLMIS, the entire sum of $2,000,000 was transferred to Fiserv (the custodian for Mr. Lustig's IRA account), and then transferred from Fiserv to Lakeview for investment with Lakeview.  After receiving the money, Lakeview transferred it along with money from other investors to Wailea to purchase an investment in Wailea.  Wailea then entered into a total return swap transaction with HSBC and transferred the $2,000,000 from Mr. Lustig together with money from other investors to HSBC as cash collateral for the swap.  HSBC, to hedge its risks under the swap, invested the cash collateral that it received from Wailea (which included the $2,000,000 from Mr. Lustig) into the Senator Fund.  The Senator Fund, a BLMIS feeder fund, in turn invested all the money that it received from HSBC (including the $2,000,000 from Mr. Lustig) into BLMIS through Senator's direct account with BLMIS, Account No. 1FR128.  The $2,000,000 withdrawn from the IRA Account on July 25, 2007, was thus reinvested back into BLMIS.  HSBC later redeemed all of its investments with Senator Fund shortly before BLMIS's collapse.  A total of approximately $95 million (which included the $2,000,000 from Mr. Lustig) was accordingly withdrawn from Senator's BLMIS Account No. 1FR128 and transferred to

Senator, and then transferred from Senator to HSBC.  The Trustee sought to avoid and recover

this $95 million transfer from Senator and HSBC in the Picard v. HSBC Adv. Pro. and ultimately

entered into a settlement agreement with Senator whereby Senator agreed to pay $95 million to

the Trustee.  With this settlement payment from Senator the Trustee achieved full recovery of the

approximately $95 million (which included the $2,000,000 from Mr. Lustig) that was withdrawn

from Senator's BLMIS Account No. 1FR128.  Accordingly, the Trustee has fully recovered the

$2,000,000 that was withdrawn from the IRA Account on July 25, 2007.

        The Trust Case.  In the Trust Case, the information and documents currently

available in the record show that the $5,000,000 withdrawal made from the Trust Account on

July 25, 2007, or the value thereof, has already been returned to the BLMIS estate.  As discussed

in detail above, Defendants withdrew this money from the Trust Account solely and specifically

for the purpose of immediately reinvesting the money back into BLMIS through Lakeview.

Upon its withdrawal from BLMIS, the entire sum of $5,000,000 was transferred to Mr. Lustig's

account at City National Bank and then transferred from City National Bank to Lakeview for

investment with Lakeview.  After receiving the money, Lakeview transferred the entire sum

along with money from other investors to Rye XL to purchase an investment in Rye XL.  Rye XL

then transferred the $5,000,000 from Defendants to one of the financial institution leverage

providers with whom it had entered into total return swap transactions as cash collateral for a

swap.[7]  To hedge its risks under the swap, the financial institution leverage provider then

_____

    [7] As noted above, at this time, without additional discovery (including discovery from the
Trustee which the Trustee has refused to provide), Defendants do not know to which particular
financial institution leverage provider this money was transferred, or for which particular swap
transaction it was transferred as collateral.  What is reasonably certain, however, is that the
money was transferred to one of the financial institution leverage providers that did swap

23

invested the cash collateral that it received from Rye XL directly into the Broad Market Fund. The Broad Market Fund, a BLMIS feeder fund, in turn invested all the money that it received from Rye XL into BLMIS through its direct account with BLMIS, Account No. 1T0027. The $5,000,000 from Defendants which was withdrawn from the Trust Account on July 24, 2007, was thus reinvested back into BLMIS, where it presumably remained until BLMIS's fraud was uncovered. Alternatively, to the extent any of this money was withdrawn from BLMIS prior to its collapse after it was reinvested back into BLMIS, it appears that the Trustee has recovered that money pursuant to the Settlement Agreement that he entered into on or about July 25, 2011, with Broad Market Fund and the other defendants in the Picard v. Tremont Adv. Pro.

In sum, the information and documents currently available in the record show that: (1) the $2,000,000 withdrawal made from the IRA Account on July 25, 2007, that the Trustee is seeking to avoid and recover in the IRA Case, or the value thereof, has already been returned to the BLMIS estate; and (2) the $5,000,000 withdrawal made from the Trust Account on July 24, 2007, that the Trustee is seeking to avoid and recover in the Trust Case, or the value thereof, has already been returned to the BLMIS estate. Notably in this regard, because "[c]ash is fungible", Dobin, 312 B.R. at 271, it is immaterial that it may not have been exactly the "same" cash taken out of the IRA Account and the Trust Account that was returned to the BLMIS estate.

The above facts clearly support the affirmative defense based on the single satisaction rule under § 550(d) asserted by Mr. Lustig and the Trust in the IRA Case and the

---

transactions with Rye XL as cash collateral for a swap.

Trust Case.  While the Trustee may dispute some of these facts,[8] it cannot be denied that these

facts, if true, support the defense and totally defeat the Trustee's claims.  The single satisfaction

rule prohibits a trustee from seeking to recover a fraudulent transfer where the transferred

property or the value thereof had already been returned to the estate.  If it is true that the

$2,000,000 withdrawn from the IRA Account and the $5,000,000 withdrawn from the Trust

Account, or the value thereof, have already been returned to the BLMIS estate, then the Trustee

is clearly barred by the rule from seeking to recover any of that money again from Mr. Lustig and

the Trust.

The Trustee thus has not and cannot possibly meet his "burden of demonstrating

to the Court to a certainty that" he would succeed on his claims "despite any set of facts which

could be proved in support of the defense."  Walsh, 585 F.Supp.2d at 555 (denying motion to

strike because plaintiff failed to establish "with the necessary 'certainty' that the record contains

no other facts on which the City could rely to prove its culpable conduct defense").  To the extent

there is any question of law concerning the applicability of the single satisfaction rule to the facts

here (which we do not believe there is), that is a separate and independent reason for denying the

Trustee's motion to strike this defense.  See Index Fund, 107 F.R.D. at 100 ("If the sufficiency of

the defense depends upon disputed questions of fact or law, then the motion to strike will be

denied.");  Salcer, 744 F.2d at 939 ("a motion to strike for insufficiency was never intended to

furnish an opportunity for the determination of disputed and substantial questions of law"; "these

---

[8]In his motion, the Trustee disputes these facts by asserting, without any support
whatsoever, that "[c]ontrary to their misleading characterization, Defendants did not return
money to the BLMIS estate."  (Trustee's Mem. Law at 7-8).  The Trustee is wrong.  As discussed
at length herein, the available information and documents show that the money has in fact been
returned to the BLMIS estate.

questions quite properly are viewed as determinable only after discovery and a hearing on the merits"). Notably, discovery on issues relevant to this defense has not been completed. As discussed above, discovery has been effectively stayed pending the adjudication of the instant motion.

Accordingly, the Trustee's motion to strike the affirmative defense based on the single satisfaction rule under § 550(d) (Tenth Affirmative Defense) should be denied.

## POINT TWO

### THE AFFIRMATIVE DEFENSES BASED ON THE COURT'S EQUITABLE POWERS UNDER § 105(a) ARE VIABLE AND MERITORIOUS (EIGHTH AND NINTH AFFIRMATIVE DEFENSES)

The affirmative defenses based on the Court's equitable powers under § 105(a) (Eighth and Ninth Affirmative Defenses) are viable and meritorious in both the IRA Case and the Trust Case. The Trustee's motion to strike these defenses should be denied.

### A.      Applicable Law

"Bankruptcy courts have long possessed equity jurisdiction in order to safeguard against unjust results." Dobin, 312 B.R. at 269. Their equitable powers have been invoked "to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." Id.

Title 11 U.S.C. § 105(a) "allows bankruptcy courts to do equity so long as the exercise thereof does not conflict with any specific provisions of the Code." Dobin, 312 B.R. at 272. This equitable power may be used to "prevent[] a trustee from being able to 'recover from a party who is innocent of wrongdoing and deserves protection.'" Bakst v. Sawran, 359 B.R. 348, 353 (Bankr. S.D. Fl. 2007) (quoting Gropper v. Unitrac, S.A., 33 B.R. 334, 337 (Bankr.

26

S.D.N.Y. 1983)).

A bankruptcy court may exercise its powers under § 105(a) to grant an "equitable credit" to a transferee of an avoidable transfer to the extent the money had already been returned to the debtor.  See Dobin, 312 B.R. at 272-73; Sawran, 359 B.R. at 354  (holding that the defendants "are entitled to an equitable credit in the amount of transfers made prepetition to the Debtor").  "Even if there are no defenses available pursuant to another section of the Code, the Court is still empowered to grant an equitable credit as a proper exercise of section 105(a)." Sawran, 359 B.R. at 354.

The granting of such an equitable credit does not contravene or conflict with a bankruptcy trustee's avoidance powers under other provisions of the Bankruptcy Code.  See Dobin, 312 B.R. at 272.  That is because the equitable credit only "concerns the Trustee's recovery under Section 550" and "has nothing to do with" his avoidance powers under other provisions of the Bankruptcy Code.  See id. (rejecting trustee's contention that the granting of an equitable credit "in effect grants [the transferee] a new defense to her avoiding powers [under § 549], in contravention of that section"; holding that "[t]he equitable credit has nothing to do with the Section 549 avoidance; rather, it concerns the Trustee's recovery under Section 550").

**B.   Analysis**

Mr. Lustig and the Trust are innocent good faith investors who have been totally devastated by BLMIS's fraud.  They have already lost all the money that the Trustee is seeking to recover from them as a result of the fraud.  They withdrew the $2,000,000 from the IRA Account and the $5,000,000 from the Trust Account solely and specifically for the purpose of immediately reinvesting the money back into BLMIS through Lakeview.   All the money was in

27

fact invested in Lakeview and ultimately reinvested into BLMS. Mr. Lustig and the Trust never actually received any of the money. When the fraud was uncovered, they lost the entirety of their investments in Lakeview. All the money has been returned to the BLMIS estate, however, as discussed above.

Under these circumstances the Trustee's attempt to recover the $2,000,000 and the $5,000,000 withdrawals from Mr. Lustig and the Trust – money that they don't have and that they never actually received– is grossly inequitable and unconscionable. The facts here present a powerful case for the Court to exercise its equitable powers under § 105(a) and grant Mr. Lustig and the Trust an equitable credit in the full amounts that have been returned to the BLMIS estate in the IRA Case ($2,000,000) and in the Trust Case ($5,000,000). See Dobin, 312 B.R. at 272-73.

The Trustee contends that granting an equitable credit in these cases "would directly contradict the priority scheme of the Code and SIPA as well as the rulings of this Court that indirect investors in BLMS – which Defendants claim to be – do not qualify as customers eligible to share in customer property." (Trustee's Mem. Law at 6). This contention is meritless. In Dobin, the trustee similarly argued that granting an equitable credit would circumvent the priority scheme for distributing the estate's property under the Bankruptcy Code and in effect give the transferee "superpriority status" with respect to its claim against the estate. See Dobin, 312 B.R. at 272. The Dobin court rejected this argument. First, the court found that there had been no determination that the transferee had a claim against the estate. Thus, to assert that its "claim" is being paid first "is to put the cart before the horse." Id. Second, the court found that the trustee's argument erroneously "presupposes that the equitable credit diminishes the estate."

28

Id.  In making this argument, "[t]he Trustee forgets . . . that every penny [the transferee] took out

has also been put back in."  Id.

   Here, as in Dobin, there has been no determination that Mr. Lustig and the Trust

have claims against the BLMIS estate for the $2,000,000 and the $5,000,000 that they withdrew

from the IRA Account and the Trust Account, respectively, to immediately reinvest in Lakeview.

In fact, they acknowledge that they are indirect investors in BLMIS through their Lakeview

investments and that, as such, they do not have direct claims against the estate for the loss of

those investments.  Moreover, as in Dobin, the Trustee's argument erroneously "presupposes that

the equitable credit diminishes the estate" and forgets that the equitable credit that Mr. Lustig and

the Trust are seeking is for money that has already been returned to the BLMIS estate.  The

equitable credit, if granted, would only operate to prevent the Trustee from recovering from Mr.

Lustig and the Trust money that has already been returned to the BLMIS estate.  It is not in any

sense a payment of customer property to them that diminishes the estate.  Finally, as the Dobin

court held, the granting of an equitable credit only "concerns the Trustee's recovery under

Section 550" and does not in any way contravene or conflict with his avoidance powers under

other provisions of the Bankruptcy Code.  Dobin, 312 B.R. at 272.

   Indeed, as in Dobin, the granting of an equitable credit here would not contravene

the Bankruptcy Code but would "actually further its aims."  Id.  As the Dobin court explained: "It

is not the objective of the bankruptcy laws to confer windfalls on debtors.  Rather, the purpose of

the recovery scheme mandated in Section 550 is to put the estate in the same position it would

have been in but for the avoided transfer."  Id. at 272-73 (quotation marks and internal citation

omitted) (finding that the granting of an equitable credit to the transferee "achieves Section 550's

29

goal, and avoids conferring a windfall on the estate").

In sum, the Eighth and Ninth Affirmative Defenses based on the Court's equitable powers under § 105(a) are viable and meritorious defenses in both the IRA Case and the Trust Case. The Trustee has not and cannot possibly meet his burden of showing that there is "no question of fact" and "no substantial question of law" that might allow these defenses to succeed. To the extent the Trustee disputes the facts or the law upon which these defenses are based, that is a reason to deny his motion to strike these defenses. See Index Fund, 107 F.R.D. at 100 ("If the sufficiency of the defense depends upon disputed questions of fact or law, then the motion to strike will be denied."); Salcer, 744 F.2d at 939 ("a motion to strike for insufficiency was never intended to furnish an opportunity for the determination of disputed and substantial questions of law"; "these questions quite properly are viewed as determinable only after discovery and a hearing on the merits").

Accordingly, the Trustee's motion to strike the affirmative defenses based on the Court's equitable powers under § 105(a) (Eighth and Ninth Affirmative Defenses) should be denied.

30

## POINT THREE

### THE AFFIRMATIVE DEFENSE BASED ON THE THEORY OF RECOUPMENT IS VIABLE AND MERITORIOUS (ELEVENTH AFFIRMATIVE DEFENSE)

The affirmative defense based on the theory of recoupment (Eleventh Affirmative Defense) is viable and meritorious in both the IRA Case and the Trust Case. The Trustee's motion to strike this defense should be denied.

### A.      Applicable Law

Recoupment is an equitable defense that may be invoked in bankruptcy proceedings. See New York State Elec. and Gas Corp. v. McMahon, 129 F.3d 93, 95-96 (2nd Cir. 1997). Essentially, "[a] 'recoupment' is an offset based upon a claim for relief arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." Styler v. Jean Bob Inc., 154 B.R. 581, 586 n.3 (D. Utah 1993). A recoupment defense may be raised where the offsetting claims arise out of "a single contract or transaction or a single set of transactions", McMahon, 129 F.3d at 96, or "a single integrated transaction[.]" Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138, 147 (2nd Cir. 2002) (quotation marks, citation, and emphasis omitted).

The recoupment defense may be raised in cases involving Ponzi schemes or other fraudulent investment schemes. It is applicable where the transferee reinvested with the debtor the payments that he received from the debtor. See Merrill v. Abbott (In re Independent Clearing House Co.), 77 B.R. 843, 877-78 (D. Utah 1987) ("[e]ven if equity did not counsel against" a rule that would deny victims of financial fraud the right of recoupment, there is "no legal theory supporting such a [rule]").

31

**B.**    **Analysis**

On the surface, neither the IRA Case nor the Trust Case is "the typical recoupment case[.]" Merrill, 77 B.R. at 878. However, "the same underlying policy applies." Id. The $2,000,000 withdrawal from the IRA Account and the immediate reinvestment of that money into Lakeview for reinvestment into BLMIS through the total return swap transaction with HSBC constitute a "single set of transactions" or a "single integrated transaction" whereby, essentially, money was taken out of a BLMIS account and reinvested into BLMIS with none of it being retained by Mr. Lustig. The same is true of the $5,000,000 withdrawal from the Trust Account. The recoupment defense is therefore applicable in these cases. See id. ("If Van Sant can prove that her total investment with the debtors was one transaction and that she did not retain payments made to her by the debtors but rather reinvested those funds with the debtors, she is entitled to either a reduction in or an abatement of the damages.").

The Trustee, apparently without any understanding of (and without making any effort to understand) the series of transactions at issue and their interconnectedness, disputes that the recoupment claims "arise out of the same contract, single integrated transaction or series of transactions." (Trustee's Mem. Law at 9-10). Because this is, at the very least, a disputed issue of fact, and to the extent this dispute also presents a question of law, it is not appropriate to grant the Trustee's motion to strike this affirmative defense. See Index Fund, 107 F.R.D. at 100 ("If the sufficiency of the defense depends upon disputed questions of fact or law, then the motion to strike will be denied."). Quite simply, the Trustee has not and cannot possibly meet his burden of showing that there is "no question of fact" and "no substantial question of law" that might allow this defense to succeed.

32

Accordingly, the Trustee's motion to strike the affirmative defense based on the theory of recoupment (Eleventh Affirmative Defense) should be denied.

### POINT FOUR

### THE TRUSTEE HAS NOT SHOWN THAT HE WILL BE PREJUDICED BY THE INCLUSION OF THE AFFIRMATIVE DEFENSES AT ISSUE

The Trustee has not and cannot meet his burden of showing that he will be prejudiced by the inclusion of the affirmative defenses at issue.

The Trustee contends that he "would be prejudiced by the onerous discovery obligations addressing the meritless defenses asserted by Defendants." (Trustee's Mem. Law at 13). However, as discussed above, the affirmative defenses at issue are viable and meritorious. Because the Trustee has not and cannot possibly meet his burden of showing that there is "no question of fact" and "no substantial question of law" that might allow any of these defenses to succeed, the Trustee's motion to strike these defenses should be denied regardless of any alleged prejudice to him from the inclusion of these defenses.

The Trustee's complaint about the burdens of having to comply with "onerous discovery obligations" is, in any event, not supportable. This is not a typical litigation between two ordinary litigants. The Trustee is represented by a large law firm well-supported by experts, analysts, consultants, etc. He has virtually unlimited resources. Mr. Lustig and the Trust, on the other hand, are innocent good faith investors who have been totally devastated by BLMIS's fraud. Mr. Lustig's life has been totally upended by the fraud. He is seventy-one years old and is being forced to spend a substantial portion of his limited remaining financial assets during his retirement years on these regrettable cases brought by the Trustee to recover from him money

33

that he had already lost as a result of BLMIS's fraud. It is unseemly for the Trustee to complain about the "burdens" of litigation under these circumstances.

It is also important to point out that the Trustee and his counsel have in their possession, custody, or control the discovery materials concerning the affirmative defenses at issue that Mr. Lustig and the Trust are seeking. All those materials, upon information and belief, have been reduced to electronic format and uploaded to centralized electronic databases or "data-rooms" for ease of access, review, and retrieval. That the Trustee and his counsel, with all their resources, have to expend time and effort to review those materials and retrieve responsive materials in response to properly-propounded discovery demands is not a reason for striking Defendants' affirmative defenses. Nor is it a reason for forcing on Defendants the additional burdens and expenses of seeking such discovery circuitously from non-parties (and imposing on such non-parties all the burdens and expenses of discovery ). The burdens that the Trustee is complaining about are just the ordinary burdens of litigation that all parties have to bear. Indeed, Mr. Lustig and the Trust and their counsel themselves have had to bear these burdens. Among other things, they have spent countless hours reviewing and producing thousands of documents in response to the Trustee's discovery demands.

In short, the Trustee has not and cannot meet his burden of showing that he will be so prejudiced by the inclusion of the affirmative defenses at issue as to warrant the very drastic and extreme measure of striking those defenses.

34

## CONCLUSION

For the foregoing reasons, and especially given the unique and compelling facts

presented in these cases, the Trustee's motion to strike certain of the affirmative defenses

asserted in the IRA Case and the Trust Case should be denied in its entirety.

Dated:  New York, New York
         March 31, 2017

                              Respectfully submitted,

                              LAW OFFICE OF
                              RICHARD E. SIGNORELLI

          By:     /s/ Richard E. Signorelli
                  /s/ Bryan Ha

                  _____
                  Richard E. Signorelli
                  Bryan Ha
                  799 Broadway, Suite 539
                  New York, NY 10003
                  Telephone:    212 254 4218
                  Facsimile:    212 254 1396
                  rsignorelli@nycLITIGATOR.com[SM]
                  www.nycLITIGATOR.com[SM]
                  Attorneys for Defendants David I. Lustig
                  and the Lustig Family 1990 Trust


FILING AND SERVICE VIA ELECTRONIC FILING